# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| BILLIE J. YOHANNES, | : | |
| Plaintiff, | : | |
| | | Case No. 3:09cv00107 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. INTRODUCTION

Plaintiff Billie J. Yohannes applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) asserting she was under a disability due to certain physical and mental impairments. The Social Security Administration initially denied her applications. She then obtained review by Administrative Law Judge (ALJ) Melvin A. Padilla, who held a hearing and later issued a written decision denying Plaintiff's DIB and SSI applications. (Tr. 18-33). In doing so, ALJ Padilla concluded that Plaintiff was not under a "disability" within the meaning of the Social Security Act and was therefore not eligible to receive DIB or SSI. *Id.*

Plaintiff brings this case seeking judicial review of ALJ Padilla's decision. This Court has jurisdiction to do so. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), the administrative record, and

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision or, at a minimum, remanding this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.     FACTUAL BACKGROUND

### A.     Plaintiff and Her Testimony

On the date she applied for DIB and SSI, and on the date of the ALJ's decision, Plaintiff's age placed her in the category of a "younger person" for social security purposes. *See* 20 C.F.R. §§404.1563(c), 416.963(c).

Plaintiff's work experience includes many jobs such as line operator, gluer, machine operator, informal waitress, salesperson, and child monitor. *See* Doc. #7 at 3 n.1 (and citations therein).

Plaintiff asserts that her disability began on November 3, 2003. She explains in her Statement of Errors that her "primary problem revolves around her urinary incontinence. These problems began after Ms. Yohannes underwent a hysterectomy (left salpingo oophorectomy with lysis of adhesions) in 2002 during which procedure her bladder was apparently injured and subsequently repaired. Tr. 285. Unfortunately, her problems did not end...." Doc. #7 at 3 (footnote omitted).

Plaintiff testified during the ALJ's hearing that she had a hard time controlling her bladder. As a result she did not think she could work on a sustained basis because she had to be able to go to the restroom when needed. (Tr. 429). Plaintiff explained that on a good day she might go to the restroom "like a normal person." (Tr. 430). But on a bad day she could "be in and out of the restroom every 20 minutes or so due to bladder problems." (Tr. 430). She also noted, "There's also times that I may think I've emptied and I'll be finished, you know, finished clean up, and then walk out. And then I'll have to go right back because the pressure's there." (Tr. 430). She estimated that she has at least

15 to 20 bad days per month. (Tr. 431).

B. **Medical Evidence**

Plaintiff has undergone multiple surgeries, in addition to the 2002 surgery (mentioned above). In August 2003 she was seen in an emergency room. The diagnostic impressions were (1) pelvic pain secondary to right ovarian cyst, and (2) hematuria, mild with a history of von Willebrand disease.[2] (Tr. 144). Three week later Plaintiff underwent an "[e]xploratory laparotomy, lysis of adhesions, and a right salpingo-oophorectomy." (Tr. 157).

Plaintiff underwent surgery in February 2004. Her preoperative diagnosis was urinary stress incontinence. (Tr. 162). A surgeon performed a Marshall-Marchetti-Kranz (MMK) procedure, sometimes referred to as a "bladder suspension procedure," *e.g.,* Tr. 174, 429-30, more descriptively, a "surgical procedure used to treat urinary incontinence in women, in whom the incontinence is caused by a weakness in the support of the bladder neck and proximal urethra." Taber's at p. 1243.

In March 2004 Plaintiff was evaluated by urologist K.E. Stanley, M.D. (Tr. 174-76). She reported several symptoms related to urinary incontinence: "leaking with sitting-to-standing position, nocturnal enuresis, leaking with coughing and sneezing, mild urinary urgency, and urge incontinence." (Tr. 174). Following an examination, Dr. Stanley noted in part, "The nature of her incontinence sounds as though she has primary intrinsic urethral weakness.... Very likely, her intrinsic urethral weakness is causing copious leaking." (Tr. 175-76).

Plaintiff underwent a formal urodynamic study in late March 2004. Dr. Stanley reported "good bladder compliance" and that her functional bladder capacity was about 400cc. (Tr. 172). However, with Valsalva (pressure testing), "she is found to leak with a

---

[2] Hematuria refers to "[b]lood in the urine." Taber's Cyclopedic Medical Dictionary at p. 910 (19th Ed. 2001). Von Willebrand's disease is a "congenital bleeding disorder...." *Id.* at p. 2250.

leak pressure point around 72 to 100 cm of water pressure." *Id*. Dr. Stanley noted, "Uroflow was normal with no evidence of obstruction. She was able to empty to completion with minimal retained urine." *Id*. Dr. Stanley's "findings confirmed that the etiology of her ongoing incontinence is not related to detrusor instability, but more in lined [sic] with intrinsic urethral weakness. This is likely related to her past pelvic surgeries as well as possibly contributed by her recent MMK." *Id*. Dr. Stanley believed that the best treatment option would include biofeedback therapy for pelvic floor strengthening." (Tr. 173). He was hesitant to recommend surgery at that time. *Id*.

In April 2004 Plaintiff reported to her treating physician, Dr. Gould, that she was experiencing low back pain and urinary incontinence. (Tr. 179). Dr. Gould prescribed Ditropan XL, *id*., which did not help. (Tr. 178). In August 2004, seven weeks after the Marshall-Marchetti-Kranz surgery, Plaintiff reported severe pain, abdominal swelling, pain in her right flank, which Dr. Gould thought might indicated a partial ureteral obstruction. (Tr. 177). Dr. Gould referred Plaintiff to a specialist. *Id*.

In May 2004 Plaintiff began seeing urologist Matthew K. Hasford, M.D. (Tr. 249-51). She continued to report urinary incontinence and urgency. She sometimes leaked without being aware her bladder was full. (Tr. 249). A cystoscopy done in June 2004 was unremarkable except for scarring on the posterior bladder wall. (Tr. 243, 249). Dr. Hasford diagnosed hypertronic bladder with incontinence and prescribed Detrol. (Tr. 239-43, 249).

One month later Plaintiff reported some improvement in urgency but was still having urgency incontinence; she also reported wearing protective undergarments during the day and at night. (Tr. 237). Dr. Hasford increased the dose of Detrol. Two weeks later Plaintiff reported an inability to void, which led Dr. Hasford to discontinue Detrol. *Id*. Plaintiff further reported that her symptoms of stress urinary incontinence had increased. And she was too embarrassed to "go out" due to her urinary leakage. *Id*.

In March 2005 Dr. Hasford responded to a questionnaire from the Ohio Bureau of

4

Disability Determinations. He diagnosed Plaintiff with hypertonic bladder and incontinence/enuresis. (Tr. 234). He concluded, "Due to her urinary frequency and urgency, patient may require frequent visits to the bathroom." (Tr. 235).

Plaintiff continued to report problems with urologic incontinence to her doctors. *E.g.,* Tr. 268, 271, 273. In January 2006 she felt that her incontinence was worsening, and she was again referred to a urologist. (Tr. 268).

Plaintiff saw Robert R. Bahnson, M.D. on June 20, 2006. (Tr. 285-86). She reported persistent urinary incontinence. (Tr. 285). Examination showed some mild right tenderness in the pelvic region. Dr. Bahnson recommended a complete urodynamic study and referred Ms. Yohannes to his colleague Jason Gilleran, M.D., an expert in voiding dysfunction and female urology. (Tr. 268).

Plaintiff saw Dr. Gilleran in November 2006 and reported stress incontinence particularly with positional changes. (Tr. 287). On examination Dr. Gilleran noted palpable scar tissue on each side of the urethra but he did not think that her bladder was overcorrected. Plaintiff's levator muscles were tender on both sides and there was some evidence of a cystocele. Dr. Gilleran recommended a standing cystogram to assess urethral anatomy in addition to a urodynamic study. (Tr. 288).

A cystogram performed a few days later showed small posterior bladder diverticula present during voiding and subtle bladder fasciculations while voiding. (Tr. 302). Dr. Gilleran felt the study showed a very elevated bladder base and an overcorrected urethra with a negative voiding angle. (Tr. 333). Urodynamic study showed normal bladder capacity but with some low amplitude detrusor activity at high volumes. Based on these findings – and the temporal relationship between her symptoms and the previous bladder surgery – Dr. Gilleran recommended an additional surgery (transvaginal urethral sling) to correct the descent of Plaintiff's bladder base. (Tr. 333).

Plaintiff underwent this surgery on January 25, 2007. Pre-operative diagnosis was

5

urge incontinence and bladder outlet obstruction. (Tr. 349-51). A significant amount of scar tissue was encountered and dissected. (Tr. 350).

After the ALJ's hearing, Plaintiff underwent bladder surgery on April 10, 2008. The preoperative diagnosis was "urinary retention, status post MMK bladder neck suspension." (Tr. 369). The surgery report states in part, "She recently demonstrated urinary retention and persistent obstruction as noted most recently on pressure-flow sturdy during urodynamics." (Tr. 369). Due to complications Plaintiff was readmitted for an infected abdominal seroma (fluid pocket) that had to be surgically drained. (Tr. 372-76). On April 10,. 2008, Dr. Gilleran wrote a brief note stating that Plaintiff "is allowed to go to the bathroom as necessary due to chronic bladder problems." (Tr. 365).

### C. Vocational Expert Testimony

A vocational expert testified during the ALJ's hearing. (Tr. 456-64). She was asked to consider a person of Plaintiff's age, education, and work experience who was limited in the manner ultimately found by the Administrative Law Judge. (Tr. 461-62). The vocational expert felt that there were jobs at the sedentary, light, and medium levels of exertion that such a person could perform. (Tr. 462). Yet if the person on a bad day needed to use the restroom up to every 20 minutes, the vocational expert testified that in most work places this would amount to too much time away from the job site and would not be tolerated. (Tr. 463).

## III. ADMINISTRATIVE REVIEW

### A. "Disability" Defined and the Sequential Evaluation

The definition of the term "disability" is essentially the same for both Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her

past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B. The ALJ's Decision

The ALJ resolved Plaintiff's disability claim by using the five-Step sequential evaluation required by the Regulations. *See* Tr. 22-33; *see also* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[3]

The ALJ concluded in pertinent part that Plaintiff had the following severe impairments (Step 2): a history of urinary incontinence with associated residuals of multiple surgical procedures she has undergone to treat this condition; anxiety and depressive disorders; adjustment disorder with anxiety disorder and depression; a diagnosis of bipolar disorder since October 2006; a history of polysubstance abuse including alcohol, marijuana, narcotic pain medication (Vicodin), and benzodiazepine (Xanax) abuse in alleged early remission. (Tr. 23). The ALJ further concluded that Plaintiff did not have an impairment, alone or in combination with other impairments, that met or equaled the criteria in the Commissioner's Listing of Impairments (Step 3). (Tr. 26). The ALJ assessed Plaintiff's Residual Functional Capacity (Step 4) as follows:

> [T]he claimant has the residual functional capacity to perform medium work.... However, she is restricted to performing jobs which would allow her easy access to restroom facilities and which would not require an immediate substitute during unscheduled restroom breaks. She is also restricted to performing low-stress jobs which do not involve teamwork, interaction with members of the general public, fast-paced work,

---

[3] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

>or strict production quotas. She should not work in contact with alcohol or drugs as part of her job duties.

(Tr. 26). The ALJ further concluded that Plaintiff could not perform her past relevant work (also Step 4). *Id*. And the ALJ found that Plaintiff could perform a significant number of jobs existing in the national economy (Step 5).

As a result of the ALJ's findings throughout the sequential evaluation, he concluded that Plaintiff was not under a disability and, as a result, was not eligible for DIB or SSI.

**IV.    JUDICIAL REVIEW**

Judicial review of an ALJ's decision determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec*. 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's

findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See Bowen*, 478 F.3d at 746 (and cases cited therein). Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error. *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors). Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass II*, 499 F.3d at 512 (and cases cited therein).

## V. DISCUSSION

### A. The Parties' Contentions

Plaintiff challenges the ALJ's decision on the following grounds:

> Vocational expert testimony supports a finding of disability, given that [Plaintiff] needs to use the restroom every 20 minutes or so on a bad day, the administrative law judge stated that he gave [Plaintiff] 'full benefit of doubt' regarding her need to use the restroom, and two treating urologists have noted [Plaintiff] needs to use the restroom frequently.

(Doc. #7 at 8).

The Commissioner contends that the "ALJ properly assessed Plaintiff history of urinary incontinence with associated residuals of multiple surgeries she had undergone to treat this condition, and he reasonably determined that Plaintiff could do work where she would have easy access to bathrooms to bathrooms and not require a substitute during a bathroom break." (Doc. #9 at 9). The Commissioner argues, for various reasons, that the ALJ properly weighed and reasonably declined to rely on the opinions of Plaintiff's urologist Dr. Hasford and reasonably declined to address the opinion of urologist Dr. Gilleran.

9

## B. The ALJ's Decision

The ALJ specifically recognized Plaintiff's testimony about her frequent, 20-minute urinary urgency by explaining, "She testified that on a good day she goes to the bathroom normally, but on bad days she urinates every twenty minutes. She claimed that she has between fifteen and twenty bad days in a month." (Tr. 20). The ALJ did not fully or specifically credit this testimony; he instead addressed the limitations Plaintiff has due to urinary problems as follows:

> She has undergone multiple surgeries in an effort to restore normal bladder and urinary functioning and curb the minimal level leakage she was experiencing. She does have some residuals of these procedures including the most recent procedure she underwent in April 2008 which was complicated by an abdominal wall seroma (Exhibit 43F). However, she has now substantially recovered from that surgery and the post-operative complications she experienced. There is no evidence of serious ongoing residuals such as an abdominal wall hernia or other condition which could conceivably limit her exertional capabilities moving forward. Restrictions which permit this person to lift consistent within a range of medium level work are appropriate under these circumstances. She may still experience some stress urinary urgency and she alleges that she also has some incontinence. Although it appears that her bladder control residuals are susceptible to adequate control with medication and the use of disposable undergarments, she has been restricted to performing jobs which would allow her easy access to restroom facilities and which would not require an immediate substitute during unscheduled restroom breaks. These restrictions are fully adequate to accommodate any urinary urgency or even incontinence that she may experience and afford this individual *the full benefit of doubt* with regard to any conflict in the evidence regarding her bladder control difficulties.

(Tr. 26) (emphasis added).

## C. Analysis

Plaintiff's need for frequent access to the restroom has been confirmed by two treating urologists. Dr. Hasford noted in March 2005, "Due to her urinary frequency and

10

urgency, patient may require frequent visits to the bathroom." (Tr. 235). The record does not contain a medical source opinion disagreeing with Dr. Hasford's opinion that Plaintiff may require frequent restroom visits. The record does contain the opinion of another treating urologist, Dr. Gilleran, who noted that Plaintiff "is allowed to go to the bathroom as necessary due to chronic bladder problems." (Tr. 365). No medical source of record disagrees with Dr. Gilleran's opinion.

A treating physician's opinion is generally entitled to more weight than the opinion of either a nonexamining medical advisor or an examining physician who saw a claimant only once. *See* 20 C.F.R. §404.1527(d)(1)-(2); *see also Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)("greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983). Yet, a treating physician's statement that a claimant is disabled is not determinative of the ultimate issue of whether the claimant is under a disability. *See* 20 C.F.R. §404.1527(e)(1); *see also Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Under the treating physician rule, a medical source opinion is given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. The reason underlying the treating physician rule is clear: the treating physician has had a greater opportunity to examine and observe the patient "and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone.'" *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. §404.1527(d)(2)).

Although the ALJ noted that Dr. Hasford had indicated Plaintiff needed "frequent bathroom visits" (Tr. 23), the ALJ gave little or no further consideration to Dr. Hasford's opinion because, according to the ALJ, Dr. Hasford "did not indicate that the extent of the

11

patient's urinary urgency was so severe that she was precluded from all work activity."
(Tr. 23). This did not constitute a valid reason under the Regulations for not fully
crediting Dr. Hasford's opinion since it does not fall within the factors under which
treating medical source opinions must be weighed. *See* 20 C.F.R. §4904.1527(d)(2)-(6).

In addition, Dr. Hasford was not asked if Plaintiff's frequent need for a restroom
would preclude all work activity. *See generally* Tr. 234-35. Nor would it have been an
appropriate question for Dr. Hasford since it is the ALJ's duty determine whether Plaintiff
was under a disability, and since Dr. Hasford is not a vocational expert. The extent to
which Ms. Yohannes's need to use the restroom precludes work is a vocational question.

The Commissioner contends, "The ALJ explained that he reasonably did not rely
on [Dr.] Hasford's opinion because it was not supported by his own findings (Tr. 23,
26)." (Doc. #9 at 11). A review of the ALJ's decision at transcript pages 23 and 26 does
not support the Commissioner's argument. The ALJ did not discuss Dr. Hasford's
opinion as the Commissioner describes. *See* Tr. 23, 26. The Commissioner further
contends that Dr. Hasford opined that Plaintiff "may require" require frequent visits to the
bathroom. The phrase "may require" is a verbatim extract from Dr. Hasford's opinion,
*see* Tr. 235, but it does not help the Commissioner because it was consistent with
Plaintiff's testimony that she has good days and bad days – or, in other words, she may
not require frequent restroom breaks on good days, but might indeed need them on bad
days when she might require restroom breaks every twenty minutes. (Tr. 429-30). The
ALJ, moreover, never addressed the statement of Dr. Gilleran regarding Plaintiff's need
to go to the restroom "as necessary," which tended to support Dr. Hasford's opinion.

In addition, the ALJ explained that he was providing Plaintiff with the "*full benefit
of doubt* with regard to any conflict in the evidence regarding her bladder control
difficulties." (Tr. 26) (emphasis added). Yet the ALJ's assessment of Plaintiff's residual
functional capacity provided her with "easy access to restroom facilities," rather than
crediting her testimony that on bad days, which occurred as often as fifteen to twenty

days a month, she needed to use the restroom up to every twenty minutes or so. (Tr. 429-31).

When "easy access to restroom facilities" was defined as a need to use the restroom up to every twenty minutes, the vocational testified that in most work places a person needing such frequent restroom breaks would need too much time away from the job site and would not be tolerated. (Tr. 463). This testimony is consistent with the conclusion in *Roush v. Commissioner*, 326 F.Supp.2d 858, 862-63, 869-70 (S.D. Ohio 2004) (Spiegel, D.J.; Hogan, M.J.) that the need to use the restroom frequently – every twenty minutes – can result in an inability to perform substantial gainful activity.

In the present case, while the ALJ professed to give Plaintiff the benefit of the doubt with respect to urinary frequency, his finding concerning "easy access to restroom facilities" go far enough because it did not incorporate Plaintiff's testimony that she needed restroom breaks every twenty minutes on bad days. The ALJ's stated intent to give Plaintiff "the full benefit of doubt" directly conflicts with his subsequent findings, leaving his opinion internally inconsistent if not arbitrary. The ALJ, moreover, cannot on the one hand credit Plaintiff's testimony and on the other hand ignore the vocational impact of those limitations she described in her testimony. The law does not require an actual witness or scientific evidence to ascertain the frequency of Plaintiff's need for a restroom. *See Roush*, 326 F.Supp. at 862.

Plaintiff's testimony regarding the frequency of her need for restroom breaks on good and bad days was consistent with treating specialist opinion. There is no medical source opinion to the contrary. The administrative law judge erred in failing to find Ms. Yohannes's disabled at Step 5 of the sequential evaluation. His decision is not supported by substantial evidence.

Accordingly, Plaintiff's Statement of Errors is well taken.

### D. Remand is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above. On remand the ALJ should be directed to (1) re-evaluate the medical source opinions of record under the legal criteria applicable under the Commissioner's Regulation and Rulings and as mandated by case law; and (2) review Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and thus eligible for DIB.

**IT IS THEREFORE RECOMMENDED THAT:**

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Billie J. Yohannes was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.


January 12, 2010

                                                                                                    s/Sharon L. Ovington
                                                                                                     Sharon L. Ovington
                                                                       United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).